Okay, the next case is number 13, 1183, Samsung International against the United States. Please proceed, Ms. Knowles. Thank you. Please proceed. Thank you, Your Honor. May it please the Court. My name is Celicia LaVorne Knowles of Ackerman, and I represent the appellant, Samsung International Inc. We are here today on an appeal of the Court of International Trade's Order for Summary Judgment of a tariff classification of a television part, specifically a plasma display panel. Is it true that the law has been changed and that this same sort of thing would now be a no-duty import? Most certainly, Your Honor. Yes. In 2007, only one year after customs made a ruling that these flat panel screen assemblies include this part. Yes. So then a resolution of this case would not affect any other case? Not that I am aware of, Your Honor. No. Not defining the term control electronics or drive electronics. Correct, Your Honor. Because these pieces get duty-free treatment. Yes. Both under NAFTA and under the new Korea-U.S. free trade agreement as well. How much, unless it's confidential, so how much money is at stake in this particular case, then? Your Honor, an estimate, and to include both this case as well as the cases that were at the Court of International Trade that were held because this is a test case. Oh, I see. So there are other cases that are going to be affected by what we do here. I'm sorry, Your Honor. Yes, Samsung cases. There are no other non-Samsung cases that I'm aware of that are currently before the CIT or the Court of Appeals for the Federal Circuit on this case. And we're talking about more or less $10 million in duties, Your Honor, with all of the cases combined. The grant and or denial of summary judgment and the definitions of tariff terms are reviewed by this Court de novo. Okay, we're pretty good on that sort of stuff. Why don't you jump to what you think they did wrong? Very good. I'm glad you asked that. Specifically, the definition of control electronics that the Court of International Trade advances is so broad that as a matter of law, it must be wrong because it fails to provide distinguishing characteristics between control and drive electronics. And I would like to walk you through it. Are you saying that the correct interpretation then has to be that which was later enacted? There is no definition of control electronics. There was no later definition of control electronics. Rather, NAFTA simply deleted the rule of origin tariff shift rule that originally exempted this product from the tariff shift qualification. And so now this product gets duty-free treatment. But there was no decision on what control electronics meant legislatively, only at the Court. At the time of that legislation, these issues were known and were on the table, were they not? At the time that the tariff, the rule of origin, no, at the time of the rule of origin, the rule of origin, there was no unharmonized tariff schedule, neither was control electronics or drive electronics. So no, it was not an issue. But these tariffs had been levied. Yes, correct, Your Honor. Yes. The definition that the CIT defined as control electronics, I'll first read to you the control electronics, and then I will also read to you what is undisputedly on the record as drive electronics. Control electronics, as provided by the CIT, performs some type of control function, including interpreting coded instructions, that's what the drivers do, determining the time and order of devices' actions, nothing on the V3 or the V4 can do that. Managing the flow of data... Wait, wait, let's be clear. Yes. It's the electronics that perform some type of control function, some type of control, such as, right? Oh, you left out the such as. Such as. So such as, these are examples of things that could, if they were present, establish it, right? But they don't all have to be present in order for it to be control electronics. Correct. They do not all have to be present, and that is exactly the problem that we're facing, is that because any one of these such as activities could be control electronics, all of these are actually activities that are undisputedly drive electronics. On the record, the driver has the DC to DC sub-voltage generation, a voltage input. It has sustained discharge, which generates sustained waveforms for the light output. It includes an energy recovery circuit. It has a logic input, which has a dedicated buffer that receives signals from the logic board and processes those signals and distributes those driving signals to other parts of the Y driver, as well as the panel. The ramp on the Y driver generates the reset waveforms of the panel. It's erased at a certain time in the image production, and the panel is made new again to produce a new picture. The scan on the Y driver generates scan waveforms. All of those functions that I've described are on the record as drive functions, which the government has conceded are drive electronics. They have also conceded that drive electronics are not the control electronics. The definitions as provided by the CIT clearly intersect with those definitions that I've just described. Again, interpreting coded instructions, determining the time and order, managing the flow of data, coordinating and synchronizing operations, governing the electrical power sent to a device, accepting commands, and carrying out instructions. The court and the government advance interpretations of definitions that blur the line between control electronics and drive electronics to a point that you render meaningless the term drive electronics. And that violates the cardinal rule of statutory interpretation, that you cannot render a term meaningless. The same was applied by this court in Warner-Lambert in the CERT case, as well as in Rocknell-Fassner. Well, I honestly don't understand this technology as well as you probably do, so let me ask some very specific technical questions. They define drive electronics as the electronics that supply a signal or electrical current to another device in order to activate it or run it. So the drive electronics are simply the electronics that supply a signal or electric current to a device. That's it. And so most of the things that you have articulated, determining the time and order of a device's applying a signal to another device. So it seems to me like the timing and control aspects that are specifically all articulated may pertain to the driving the functionality of the flat panel assembly, but aren't actually completely within a very narrow definition of drive electronics, as I understand has been adopted. You want me to find that these two things have been given completely overlapping meaning, and I guess the way I read drive electronics, it's very narrowly interpreted below, and control electronics is much more broadly interpreted, so I don't see that, so why don't you tell me why I'm wrong? Most certainly. First of all, again, under the cardinal rule of statutory interpretation, you cannot give definitions to two different terms that would render one meaningless. The definitions that's provided under control electronics essentially do that, because I have just described activities which the government has conceded are drive electronics. No, they're related to drive. They're related to driving, but the government defined drive electronics as electronics that supply a signal to another device. That's it. That's all that is encompassed in the drive electronics. Nothing more. So, for example, when the control electronics include determining timing and order of a device's actions, that's broader, it seems to me, than the drive electronics definition. Well, then if we are to adopt that, then what we have on the flat panel screen assembly has no drive electronics, because, again, the descriptions of the drivers that I have defined for you that is undisputedly on the record as to what the drivers do, which the government conceded are drive electronics, is exactly what the logic board does. The logic board, in essence, does exactly the same thing that the drivers do on the PDP itself. Taken all together, the logic board, the Y driver, the X driver, the logic buffer, all of those together make up the drive electronics that drive an information on the display. Because most basically, the PDP is an information display. So what we need to do is understand what drives the information and what controls that information. There is nothing on the V3 or the V4 upon import into Mexico that can control the information that is on the screen. What their experts have said is that you just need the minimum amount of circuitry to test the device. Well, in actuality, when this part comes in to Mexico, you put a power supply to it, nothing happens. Absolutely nothing happens. If you were to add control electronics and the power supply, what you would see on the screen is the words, no signal, meaning the control electronics is actually working. It is sending information to the drive electronics, dictating to the drive electronics what to do, what to put up on the screen. Not necessarily an image. You would need then the television image or a DVD image to come forward. In addition, if you were to send the image information to the PDP, the PDP could do nothing with it. The logic board is incapable of reading the language of the tuner or of the signals coming in, and therefore incapable of controlling it. Time out for a second. One of the things I just understood you to say is that one of the reasons the logic board can't be the control electronics is because it's not capable of reading what comes in through the tuners or interpreting it, right? Isn't that what you just said? That is one way to look at it. But I guess here's the problem. Tuners are expressly listed as a separate part under the tariff. So it seems, I guess when I think control electronics, I don't know what to think. You're telling me control electronics have to drive the whole TV, including the tuners, and that is actually expressly listed under the tariff as a separate part apart from flat panel screen assembly. I understood the government's argument to be the control electronics for the flat panel screen assembly are just those necessary to drive the flat panel screen assembly and not those necessary to incorporate all the other parts together and make the whole thing work. Your Honor, we agree that what we need to do is understand what controls the PDP module, not the full TV. We agree with that. We do not argue contrary to what the government thinks we're arguing. We do not argue that what controls the whole TV is necessary for the PDP to be a flat panel screen assembly. It just so happens that the Samsung mainboard that is manufactured in Mexico contains control functions of the television as well as control functions of the PDP. We cannot sit here and assume what if this part came in with this, what if this part came in with that. Per MITA copy start, you have to look at what was imported, the condition of the product when imported. The condition when imported had no control electronics. The mainboard is made up of two different boards, the analog board and the digital board. So it is altogether possible that the tuner be kept on the mainboard. So if we were to say that the mainboard is a necessary element before you have a flat panel screen assembly, then what is left of that? Isn't that essentially a plasma TV? There's no other real parts, meaningful parts left before you have the finished product. No, Your Honor. The mainboard can be split up. So for example, we could split up those electronics that are on the mainboard that would control the plasma display panel. It just so happens they're on the mainboard. But you could split them up. We are not arguing that you need all of the electronics on the mainboard on the PDP. They just happen to be on the mainboard. But as a matter of fact, you have to somehow assemble the mainboard together with the PDP before you have the flat panel screen assembly in your estimation, right? You need to have control electronics onto the PDP to make the PDP operate. Indeed. Yes. Well, I mean, you're not suggesting as a practical matter that your mainboard is somehow getting chopped up and only a portion of the mainboard is getting first assembled with the PDP. And then you have a flat panel screen assembly. And then maybe sometime after that, you put the rest of the mainboard together with that. No, the entire television is manufactured in Mexico. Hours, months of work is gone into the manufacturing of the television in Mexico. So what is imported from Korea is not a flat panel screen assembly because you have none of the electronics that can control the PDP. But moreover, with respect to what you need to get an unfinished television, you actually, the government doesn't even go through the analysis and the CIT didn't go through the analysis. You need all of the U.S. Note 10 under the harmonized tariff schedule to get an unfinished television. So it is altogether possible that you have the mainboard and you still don't have an unfinished television. And more interestingly, an unfinished television of 8528-1204 and 8528-1208 do get the tariff. So how is it that something much more advanced than a flat panel screen assembly gets the tariff shift and this part does not? Okay, let's hear from the government. Thank you, Your Honor. To give their view on all of this. Thank you. Good morning. May it please the Court. The child court's decision should be affirmed because the child court's interpretation of the term controlled electronics is correct. The child court looked at the sources that the parties provided as well as expert testimony in the form of depositions and expert reports. And that's how it arrived at its definition of controlled electronics. Contrary to Samsung's position, that definition is not overly broad. I would submit that it's comprehensive. It makes sure that, together with drive electronics, it makes sure that there's a distinction. That drive electronics, as the Court recognized, is very narrow. They only do what they're told. Whereas controlled electronics has a wide range of functions. But are they all drive functions? Are all of the functions, after the such-as word, simply drive functions? Absolutely not. The way the Court has described drive function is that they just simply supply the signal to another device to activate it or run it. That's all drive electronics does. Controlled electronics is much more comprehensive, does much more. It actually controls or manages or governs or directs another device. And I think that's where the main distinction is. And within that definition, the Court has listed a whole bunch of indicators, I would say, that show what controlled electronics are. I don't understand when you say it controls another device. What other device are we talking about? In this case, another device would be the logic board managing, directing, governing the drivers. It is actually directing the drivers. Drivers turn on. Drivers turn off. Drivers, how long to stay on, how bright to stay on, so you can see the image on the screen. How is that different from what the driver is doing to the electrode? I mean, I guess one could argue that the driver is somehow managing, governing, activating the electrodes, right? Well, let me go back. In order for the logic board to do all of that, there's a lot of computation going on. So it's not just electrodes light up. It's more or less, I'm getting a signal from the main board. What do I need to do that signal to pass that information on to the driver? I need to store that information. I need to compute it in order to get that brightness level, the timing sequences, so the pixel can show up on the screen. So it's more than just light up. It's a number of computations going on behind the scenes. Are you saying that the logic board is essentially responsible for making sure that the right signal gets to the right driver at the right time? I would submit that that's correct. It's making sure that the driver gets that timing information so that it can display, light up that pixel so that you can see it on the screen, and at the correct brightness. Yes? I would like to go back just for one minute. At the outset, the court had asked whether this case had any kind of essentially precedential value. I just want to advise the court, there are no cases in the CIT in here, but there is a case that was before this court on a jurisdictional issue. It was Hitachi. And that case was actually moving along behind this case, but got kicked back to Customs on jurisdictional ground. So if this case is decided, there is some precedential effect going backwards. Why didn't the CIT just flat out adopt the pioneer ruling? Well, in terms of statutory interpretation, that's for the judge to do. That's for the court to do. It's a matter of law. So I think the judge looked at the pioneer ruling, and also looked at the fact that the pioneer ruling didn't really come up in the context of where we are now. It was a logic board. So I think the court looked at it, and I'm going to give it some deference, but I'm going to do my job and go ahead and make sure I look at these terms and come up with a definition. So she didn't necessarily say it was wrong. I think she actually sort of expanded on that definition. When it comes to understanding the terms in the harmonized tariff schedule, is it very standard to always be looking at dictionary definitions? Absolutely. Absolutely. The way statutory interpretation works is you start with the language of the statute, and it is the common and commercial meaning that you're looking for. And you're supposed to go and look at... I guess sometimes these are technical terms, so that's why I'm just trying to figure out in this part of the law, how often do you run to general dictionaries? A lot. That is the first place you run to, because it's supposed to be the common meaning. It's for importers. You're supposed to be able to pull the dictionary off the shelf and find the term. A lot of times you might not find the term, so you might have to consult technical sources or actually go out and get an expert who can provide you with additional technical sources as well as his or her opinion on the term. And then what happens when the other side comes forward with expert testimony, like they did here? Expert testimony is advisory. So in the sense that the court's always usually going to go with a lexicon. But in terms of expert testimony, to the extent it's consistent with the common meaning found in a dictionary, it just provides additional support for it. To the extent it's inconsistent, then, like the court did here, it's just not persuasive. How does the fact that the CIT adopted a different definition from the Pioneer ruling affect your argument that we should give deference? I don't see her definition. The court's definition is different. I see it as more expansive. The court didn't say we're going to toss Pioneer's definition to the side. The court said, I'm going to give it some deference, but I'm also going to look further. The thing is that when Customs is looking at an issue, it's looking at it in the issue that was brought up before it. So in that case, it was Pioneer, it was Pioneer's panel, it was the DVA, so it went out and found definitions. Well, I guess the point is the CIT broadened, maybe that's the way to put it, the Pioneer definition. So the CIT did conclude that the agency's definition was too narrow, and so therefore if I, I guess I'm trying to figure out how I incorporate Skidmore or Chevron type deference into that sort of scenario. You're advocating now in favor of the CIT definition, which is not clearly the same definition that was in the Pioneer ruling. So I'm not sure, it's like you're arguing for deference for something that you didn't exactly get below. Well, what the court had said below was that she was going to consider it to some extent. That's what the judge had said in her. In footnote 21, it says, quote, the CIT does not adopt the Pioneer definition. Right. She expressly rejected the Pioneer definition. She does not adopt them. And then she proffered her own definition. And I guess I'm wondering, what are you advocating for, the Pioneer definition or Judge Rastani's definition? Which one of those two are you advocating for? We're advocating for Judge Rastani's definition. Well, then that's not consistent with, or I don't know if it's not consistent with, that may be the wrong way to put it. But it's not identical to the Pioneer one. So why does agency deference weigh at all in favor of you getting Judge Rastani's definition? Judge Rastani's not part of the agency, right? Correct. She doesn't get deference. Correct. Okay. So you're advocating we should adopt her definition. Yes. Why then would Skidmore deference help you? Well, the thing is, in the Pioneer definition, she didn't necessarily reject it. She said, in conducting its own analysis, the court considers the Pioneer definitions to some extent, because customs after notice and comment determine the common definition of drive and control of electronics in the context of a flat panel screen assembly as opposed to a complete television. So what she's saying is, I'm going to give it some deference, because they did do the right analysis. But what page does she say that on? I have it on the, is this addendum to plaintiff's brief, this page? It's actually page 14 of the decision. In the footnote? Footnote 19. I'm sorry. I can't tell. The court extends, she rejected, she rejected giving you Skidmore deference on this. The court, in footnote 19, the court extends Skidmore deference to custom rulings, only to the extent the ruling has the power to persuade. Consistent with the court's independent responsibility to decide legal issues, including the proper meaning of a tariff term, the court does not adopt the Pioneering ruling definitions of drive and control electronics in toto. The Pioneering ruling did not attempt to classify a logic board, so you're saying that she did adopt them in part. If you keep reading further, it says, right, the Pioneering ruling did not attempt to classify a logic board, which is determinative here, in conducting its own analysis, the court considers the Pioneering definitions to some extent, because customs after notice and comment, period, determined a definition of drive and control electronics in the context of a flat panel screen assembly as opposed to a complete television. So she did give it some deference. She doesn't explain how it works into a decision, but if you look at the actual definition that she comes up with, she does have, in here, determining the time and order of a device's action. So it's not like the Pioneer definition isn't consistent with her definition. She took it and then sort of expanded on it. Would you make, then, a footnote 21, which is on page, addendum 22, where she expressly says the court does not adopt the Pioneer definition. Right. I think she's not adopting them. Adopting them would be, I'm just adopting them wholeheartedly, and I'm not really making any changes to them. I think she considered them. She looked at it, she said, okay, maybe it's a great start. It was, as does Skidmore, need factors, logical, thorough. If you look at the Pioneer ruling, the sources in the Pioneer ruling are the same sources that she looked at to come up with her definition. I think you understand my problem. My problem is you're arguing that we ought to affirm Judge Rastani's definition, which, from her opinion, does not adopt the Pioneer definition. Whether you want to say she glosses it, she changes it, she adds to it, whatever, it doesn't adopt the agency's definition. And yet one of your arguments on appeal is I should adopt her definition because you're entitled to Skidmore's efforts. And that's what I'm finding troubling is you want me to adopt her definition, but that isn't the agency's definition. I think the argument that we're making is not that you should adopt her definition because of Skidmore deference. Our argument in our brief is that you should adopt it because it's correct. Aside from Skidmore deference, if you look at the- No, I get that. But one of your arguments is that if we think it's close and ambiguous and are uncertain, we should adopt it by virtue of the agency being entitled to deference. And I'm sort of wondering if that's true here, given that the thing you're advocating, I should adopt, isn't the thing the agency came up with. The argument that we're making is that- Do you not argue Skidmore deference? Did I totally mistake this case? No, we do argue Skidmore deference, but I think we're not arguing that if her definition is somehow ambiguous, because it's not. It's not ambiguous. We're saying that the ruling should get some sort of consideration when you are looking at her definition. I think we'll figure it out. Would you care to comment on what really seems to be the heart of the issue? And that's your opponent's comment, that so much additional work was done in Mexico with the imported product that it was indeed a transformation under the statute. Sure. If you actually look at, and I have it here in the appendix, there's a description provided by SAMHSA as to what actually happens in Mexico. The appendix, page 1066, may actually go through the analysis of what happens in Mexico. The only thing substantive that happens in Mexico is the main board is added. So in terms of there's this comprehensive assembly process going on in Mexico, that's not borne out by the evidence here. This description here says the only thing that's of substance is the main board is added. If you look in the appendix, there's a picture of the panel. The panel is at A256, and you can see it's fairly comprehensive. If you actually look... Wait, wait. You said the only thing is the main board. No, on 1066 it explains... Okay, so am I going to violate confidentiality if I talk about all the other things that are done in Mexico? Because you've got it marked confidential, and I don't want to violate your confidentiality. It's okay, you're on. Okay. So it says assembly of the bracket printed circuit boards, bracket support stands, inlet AV, lead connectors, low voltage differential swing cable, and the main board are all assembled and produced by SSII in Mexico and mounted on or connected to the PDP module. It's not just the main board. It's not just like, let's just plug the main board in too, and boom, it's out the door. It seems like a lot of stuff is going on. But that's all minor. If you take a look at it, bracket printed circuit boards, bracket support stands, inlet AV, lead connectors. The thing is, if you listen to what counsel said and if you look at the materials, the things that actually make a television are the thing that's in Mexico, the main board, and everything on the panel. So in terms of substance, once that thing is mounted on the panel, there's nothing else to do but essentially put the back on it and put all of these minor, minor things on it. But isn't the main board manufactured in Mexico? And that's what I said. The only thing of substance is the main board that's put on. But it's not just that you take something and connect it, right? The whole main board with all those electronics are manufactured in Mexico too. Doesn't that take time, the process of creating the main board? I'm not sure. No, there's no evidence in the record that it does. You're not sure. I'm telling you what's in the record. It says it's mounted. It's mounted on there. Wait, did it just pop into existence? I'm just telling you what's in the record. No, the record says it was manufactured in Mexico. And here where it says how you put it on, it says it's just mounted or connected. Yes, but it has to be created first before it can be mounted, right? Right. It doesn't just pop into existence. So a large portion of the development is actually creating all of those electronics on the main board. And that's all done in Mexico. But let me just go back. And I was trying to show you the picture of the panel. If you look in the appendix on page 256, this is the back of the panel. When you look at a plasma television, you're seeing the glass sandwich with the gas in it. And when you turn it around and you take the back off, this is the panel. This is the main part of a plasma television. This is what gives a plasma television its identity. It's this panel. So yes, there is substance going on in Mexico, but there's a lot of substance going on before it even hits Mexico. And that's where this logic board is, and that's why it has to control electronics. This picture is indecisive enough to me. So what am I looking at? I don't need you to walk me through the electronics. Is this the main board or is this the logic board? That is the back of a PDP panel. The only thing missing from that is the power supply, which would be in the middle. Those are significant electronics. When you say this is the back of the PDP panel, I mean, when I say it's indecipherable, I mean that it's all black and virtually I can't read it or identify anything on this page. It's like a really, really, really blurry photo. And so I guess what I'm trying to ask you is, is some portion of this the main board? No, this is all the drivers and the logic board. Okay, so which portion is the logic board? Down in the center in the middle. This portion right here is the logic board. Where is the main board? The main board gets put on in Mexico. Show me a picture of what it looks like. You'd have to ask Samsung for a picture of the main board. Pardon? I don't have a picture of the main board. Okay, but you're trying to convince us that basically this is the whole TV for the most part. At least that's what I'm understanding. It's a substantial portion of the TV. I think we need to bring the focus back to what comes out of Korea and into Mexico. What happens in Mexico with the main board really has nothing to do with how you classify this panel. NASA clarification deals with control electronics with respect to the panel. So that's the issue. What happens in Mexico really has nothing to do with whether this thing, when it's imported into Mexico, has control electronics on it. I guess the point of this appeal is we have to decide which board has the control electronics, the logic board or the main board. And if your argument is if it's the main board, then once you include the main board with the PDP module, then you have everything that's virtually the bottom line of a plasma TV except for a few cables and brackets. And so that can't be the case under the classification laws. I think that's actually not the issue. We don't have to decide whether the main board has control electronics. It might have control electronics. We have to decide when. No, if you designate the main board as being the board with the control electronics and therefore the logic board does not have the control electronics, your position would be that that would create this direct tension with the classification laws because then you would have essentially at bottom a plasma TV on your hand once you connect the main board to the PDP module because all that's left is basically in its essential character a plasma television. Let me go back to your question. If you did connect the main board to the panel, we would submit that it's almost a television. But I think you have to go back and getting sidetracked with the main board because the main board, again, it can have control electronics. And as the trial court said, there could be more than one control electronics in a television. It's what controls the panel. The main board can control the television. It can control a whole bunch of different things. There's nothing that says that it can't be other components that have control electronics. I think that's the thing that's getting lost here. The NASA clarification says you look at the panel and does this panel itself have control electronics? Not the main board. It can have control electronics, but for purpose of the clarification, does this panel have control electronics? I think that's the issue. I think deciding whether the main board has it and the logic board can't, I think that's not the focus of the clarification because the clarification is on that flat panel screen assembly and that module as it comes in. Any more questions? Thank you, Michelle. Your Honor, to your question, if you added the main board onto the PDP, no, you would not have a finished television. They failed to go through the required analysis that the courts and customs follow, which is you have to look to see if all of the elements of U.S. Note 10 are included. No, but the question is how much additional transformation takes place. Is it not whether when you push the button it goes on? Correct. Significant amount. The PDP is a part, one of hundreds of parts to make a finished television in Mexico. More importantly, the appendix that my opponent tries to point out to, the question is what happens to the PDP? The question was not how do you create a TV? That is the most important part to understand what was being asked. But also... I guess the question is, once you connect the main board to the PDP module, what you have left before you have a finished TV is adding some brackets and cables. No, Your Honor, not just brackets and cables. You still need the speaker, you still need the chassis, you still need... The chassis I thought was part of the PDP module. No, you have a chassis of the PDP, but you still need the chassis of the entire television. The frame. The frame, the box, the housing, if you will. All of those elements, speakers, the chassis, other elements that are not on the main board are required for an unfinished television, not even a full television. And again, an unfinished television gets the tariff shift. So we go back to our point that NAFTA, the public policy and intent of NAFTA was not to include this PDP as a flat panel screen assembly. Particularly when you look at the fact that this part, if it's a flat panel screen assembly, if you follow the CIT and customs, it gets a duty when you import that part here into the United States of 2.9%. It gets no duty. If you import that into Mexico and into Canada. It is inconceivable to me that the United States intended for this part to fit within a flat panel screen assembly and get duty treatment here, but be duty-free with our neighbors. That completely flies in the face of the intent of NAFTA. The government is correct. You start at the statute to determine legislative intent. The statute reads subheading 85, 29, 90, 53 is a flat panel screen assembly for the apparatus of subheadings and it lists a bunch of subheadings, 12 of them, only 12. These 12 subheadings are for color televisions, color video monitors, color projectors, meaning that you have to have an apparatus that is unique to the color. As imported, the V3 and the V4 had no color capabilities. All of the color capabilities are created on the main board in the LVDS format, which is the instructions that the PDP module needs in order to operate. We can absolutely use some of the government's definitions. She just explained, drivers just do what they're told. They don't govern or manage or control. The logic board just does what it's told. What's wrong with my summary, the rough cut summary of the logic board is making sure it gets the right signals to the right driver at the right time. I would respectfully disagree with that summary because let's assume the logic board receives the instructions and improperly sends something out. It has no way to fix that improper instruction. Or if the instruction coming in is incorrect, the tree is supposed to be green, but the instruction coming in is red, the logic board will send that instruction out. It has no capability to say, hmm, the instruction on the screen is incorrect or the instruction on the screen should last for 10 seconds. You should see this image for 10 seconds. It has no capability to regulate, to dictate, to manage, to govern. All of those verbs, if you actually apply it under just basic, common sense English description of those verbs, do not define the logic board. Does that answer any more questions? Okay, thank you. Thank you, Your Honor. Please take it under submission.